## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



**FILED**

Feb 21 2020, 9:04 am

**CLERK**
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Jeffery M. Haupt
South Bend, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Courtney L. Staton
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

L.C.,
*Appellant-Defendant,*

v.

State of Indiana,
*Appellee-Plaintiff.*

February 21, 2020

Court of Appeals Case No.
19A-JV-2294

Appeal from the St. Joseph Probate Court

The Honorable Jason Cichowicz, Judge

The Honorable Graham Polando, Magistrate

Trial Court Cause No.
71J01-1902-JD-62

**Riley, Judge.**

# STATEMENT OF THE CASE

Appellant-Defendant, L.C. (L.C.), appeals the juvenile court's Order, committing her to the Department of Correction (DOC).

We affirm.

# ISSUE

L.C. raises one issue on appeal which we restate as: Whether the juvenile court abused its discretion by committing her to the DOC.

# FACTS AND PROCEDURAL HISTORY

At approximately 7:30 p.m. on February 9, 2019, South Bend Police Department Officer Taylor Tobias (Officer Tobias) and two other officers were dispatched to a fight at 2617 West Westmoor Street. There was a lot of commotion inside the residence when the officers arrived, and there were about a dozen juveniles throughout the house. Officer Tobias proceeded to the bedroom where he encountered a verbal altercation between seventeen-year-old L.C., another female juvenile, A.S., and Robert Porter (Porter), L.C.'s mother's boyfriend. L.C. and A.S. were upset with Porter because Porter had unplugged the internet. To calm down the argument, Officer Tobias removed Porter from the bedroom. L.C. continued to yell at Porter, claiming that she would "beat [] Porter's ass, and she did not care about the police being present." (Appellant's App. Vol. II, p. 65). "[L.C.] also yelled that she was going to spit on [] Porter." (Appellant's App. Vol. II, p. 65).

[5] Following her remarks, L.C. "pulled out a purple [] Taser and began waving it around and turning it on and off." (Appellant's App. Vol. II, p. 65). Officer Tobias retrieved his Taser from his holster and placed it on a ready position, while he issued loud verbal commands to L.C. to drop her Taser. L.C. complied. The assisting officers subsequently secured L.C. in handcuffs. While restrained, and referring to Porter, L.C. continued to yell, "I'm going to beat the fuck out of him! I'm beating that mother fucker's ass[.] I'll mace [and] taze [sic] that bitch! I don't care on my granny[.] I'm gonna do something to him tonight!" (Appellant's App. Vol. II, p. 65). L.C. was thereafter transported to St. Joseph County Juvenile Justice Center.

[6] On February 28, 2019, the State filed a delinquency petition, alleging that L.C. had committed what would be Class B misdemeanor disorderly conduct and Class A misdemeanor intimidation if committed by an adult. That same day, an initial hearing was held during which L.C. admitted to the Class B misdemeanor disorderly conduct allegation in the petition.

[7] Pending her disposition, the probation department completed a pre-disposition report (PDR). L.C. scored in the "**HIGH** risk category to reoffend." (Appellant's App. Vol. II, p. 76) (bold in original). The report stated that L.C. has had nine contacts with the juvenile justice system, resulting in several adjudications. L.C.'s most significant delinquent adjudication was in 2016 for two Level 6 felonies if they had been committed by an adult, *i.e.*, battery on a public safety official and felony escape. As a result of those adjudications, L.C. was ordered to undergo residential treatment at Oaklawn in 2017. The intake

form at Oaklawn revealed that L.C. needed "24/7 care and lock-secure residential treatment due [to] her (sic) elopement behaviors and physical aggression." (Appellant's App. Vol. II, p. 34). L.C.'s discharge form from Oaklawn showed that L.C.'s ten-month commitment had been beneficial. In particular, L.C. had maintained respect toward the staff; she showed leadership by teaching new peers what to do; and she earned eight high school credits and was motivated to graduate high school and attend college. However, three months following her discharge from Oaklawn, L.C.'s behavior deteriorated, and she reverted to her errant behavior. L.C.'s mother believed that L.C.'s negative behavior was because L.C. was associating herself with the wrong peers.

[8] On April 15, 2019, the juvenile court conducted a dispositional hearing in the present case. The trial court subsequently ordered L.C. to be placed in home detention for 90 days and to participate in the St. Joseph County Juvenile Justice Center's Day Reporting Program (Day Reporting Program). On June 19, 2019, and July 24, 2019, L.C.'s urine sample tested positive for marijuana. In July 2019, L.C.'s attendance at the Day Reporting Program was erratic, and her last appointment was on July 30, 2019. On August 8, 2019, L.C. contacted the program's director and indicated that she "did not have time for Day Reporting, was not going to return to Day Reporting, and [] that she just wanted to finish her time out at DOC." (Appellant's App. Vol. II, p. 28).

[9] The St. Joseph County Probation Department (Probation Department) filed a Status Report advising the juvenile court that L.C. had stopped attending the

Day Reporting Program. Based on the Status Report, the trial court ordered that two hearings be set: the first on August 12, 2019, to determine whether L.C. should be detained pending a modification hearing; and the second on September 3, 2019, for a modification hearing. L.C. did not appear on August 12, 2019, and as a result, the trial court issued a body attachment for her arrest. Shortly thereafter, L.C. was arrested. The modification hearing that was previously set on September 3, 2019, took place as scheduled. At that hearing, the State recommended that L.C. be committed to the DOC. At the conclusion of that hearing, and following the Probation Department's recommendation, the juvenile court ordered L.C. to be committed to the DOC.

[10] L.C. now appeals. Additional information will be provided as necessary.

## DISCUSSION AND DECISION

[11] L.C. argues that the juvenile court erred by committing her to the DOC because it is not the least restrictive option. "The juvenile court has discretion in choosing the disposition for a juvenile adjudicated delinquent." *D.E. v. State*, 962 N.E.2d 94, 96 (Ind. Ct. App. 2011) (citing *L.L. v. State*, 774 N.E.2d 554, 556 (Ind. Ct. App. 2002), *trans. denied*). "This discretion is subject to the statutory considerations of the welfare of the child, the safety of the community, and the policy of favoring the least harsh disposition." *Id*. "We may overturn a disposition order only if the court abused its discretion." *Id*. "An abuse of discretion occurs when the juvenile court's judgment is clearly against the logic

and effect of the facts and circumstances before it, or the reasonable, probable, and actual deductions to be drawn therefrom." *Id.*

[12] Indiana Code section 31-37-18-6 states:

> If consistent with the safety of the community and the best interest of the child, the juvenile court shall enter a dispositional decree that:
>
> (1) is:
>
> > (A) in the least restrictive (most family like) and most appropriate setting available; and
> >
> > (B) close to the parents' home, consistent with the best interest and special needs of the child;
>
> (2) least interferes with family autonomy;
>
> (3) is least disruptive of family life;
>
> (4) imposes the least restraint on the freedom of the child and the child's parent, guardian, or custodian; and
>
> (5) provides a reasonable opportunity for participation by the child's parent, guardian, or custodian.

[13] "Without question, the statute requires placement in the least restrictive setting only '[i]f consistent with the safety of the community and the best interest of the child.'" *J.S. v. State*, 881 N.E.2d 26, 29 (Ind. Ct. App. 2008) (quoting I.C. § 31-

37-18-6). "Thus, the statute recognizes that in certain situations the best interest of the child is better served by a more restrictive placement." *Id.*

[14] In her brief, L.C. contends that her commitment to the DOC interferes with family autonomy, imposes the greatest restraint on her freedom, and is not the least restrictive alternative available. She continues by stating that she had previously completed a residential program at Oaklawn in 2017 which is evident that less restrictive placements have been successful and by making her a ward of the DOC, the juvenile court "essentially gave little weight to what progress she had previously shown . . . [in] 2017." (Appellant's Br. p. 10).

[15] The PDR, which was reviewed and adopted by the juvenile court when issuing the modification of disposition Order, reveals that L.C. had a history of running away from home and absconding from home detention. The report stated that L.C. left home four times without parental permission between April 2016 and February 2017. In March 2017, L.C. absconded from home detention and she cut off her ankle monitor. In May 2017, L.C. again absconded from home detention, cut her ankle monitor, and "was gone for 83 days." (Appellant's App. Vol. II, p. 75).

[16] Following the disposition that led to her residential commitment in Oaklawn 2017, the intake report showed that L.C. needed "24/7 care and lock-secure residential treatment due [to] her (sic) elopement behaviors and physical aggression." (Appellant's App. Vol. II, p. 34). Indeed, L.C.'s ten-month commitment at the facility indicated that L.C. had benefited from the program,

however, after she was discharged from Oaklawn, L.C.'s good behavior "completely changed" in less than three months. (Appellant's App. Vol. II, p. 75). L.C.'s mother believed that L.C.'s negative behavior was because L.C. was associating herself with the wrong peers.

[17] The PDR also noted that approximately one month before the altercation between L.C. and Porter, L.C. had threatened to mace her teacher. Specifically, on January 10, 2019, L.C. went to school close to noon even though her classes were over for the day. During "lock-out," a teacher requested L.C. "to quiet down. [L.C.] got up and said, I outta [sic] mace that bitch! She took out a can of mace out of her pocket and shook it." (Appellant's App. Vol. II, p. 73). Thereafter, L.C. and another student ran out of the classroom and attempted to evade security and school personnel, but they were both restrained. The student resource officer spoke with L.C. and L.C. replied that "she ought to spit in his face, and that police officers do not live long." (Appellant's App. Vol. II, p. 74). When L.C.'s mother arrived at school to take L.C. home, L.C. told her mother to "[g]o get the motherfucking car!" (Appellant's App. Vol. II, p. 74). As a result of her overall behavior that day, L.C. received a five-day suspension and expulsion was recommended.

[18] Further following her disposition in the present case, L.C. failed two drug screens between June 2019 and July 2019. L.C. additionally failed to attend the Day Reporting program in July 2019, and in August 2019, L.C. informed the program director that she wished to complete her probation in the DOC.

[19] "In some instances, confinement may be one of the most effective rehabilitative techniques available" when a juvenile is exposed to the type of placement she would encounter were she to continue with her poor behavior. *K.A. v. State*, 775 N.E.2d 382, 387 (Ind. Ct. App. 2002) (internal quotation omitted), *trans. denied.*

[20] L.C. quite simply has made too many bad choices and has left the juvenile justice system with no alternative but to order that she be committed to the DOC. As noted, L.C. has had nine contacts with the juvenile justice system and as a result of those previous contacts, L.C. had received GPS monitoring, home detention, residential commitment, probation, and substance abuse treatment. The fact that prior placements and rehabilitative programs have proven unsuccessful, paired with L.C.'s high risk of recidivism, L.C.'s use of drugs during probation, and L.C.'s request that she completes the remainder of her probation in the DOC, lead us to conclude that the juvenile court's modification of disposition order was not clearly against the logic and effect of the facts and circumstances. *See L.L. v. State*, 774 N.E.2d 554, 556 (Ind. Ct. App. 2002) (holding that DOC placement, despite the availability of a less-restrictive option, was not an abuse of discretion when the juvenile had been given several opportunities to better himself and had been given several warnings of the consequences of continuing to act improperly and still violated his probation), *trans. denied.*

# CONCLUSION

Here, we conclude that the juvenile court did not abuse its discretion by placing L.C. in the custody of the DOC.

Affirmed.

Baker, J. and Brown, J. concur